## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | NO. CR 06-0550 RB |
| | ) | |
| ALONSO MARQUEZ-DIAZ, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** came before the Court on Defendant's (Alonso Marquez-Diaz) Motion to Suppress (Doc. 27), filed on May 15, 2006.  The Government filed a response and, on June 7, 2006, I heard testimony and argument on this motion.  Having reviewed the parties' submissions, relevant law, and being otherwise fully advised, I deny this motion for the following reasons.

**I.    Facts**.

The night of Thursday, February 23, 2006, New Mexico State Police ("NMSP") Officer Cory Crayton was on duty, patrolling U.S. Highway 54 ("U.S. 54"), in Lincoln County, New Mexico.  Just before midnight, the officer's marked NMSP cruiser was parked, facing south, along U.S. 54 south of Carrizozo, New Mexico.  With the head lights extinguished, the officer's patrol unit was not visible to passing traffic from a distance.

Around 11:50 p.m., Officer Crayton "clocked" a northbound, red Dodge pickup truck traveling the posted speed limit: 55 miles per hour ("mph").  When it neared the officer's position, the vehicle slowed to 50 mph.  Officer Crayton found this conduct consistent with someone unusually interested in avoiding being stopped by authorities.

Suspicious, the officer turned his patrol unit north onto U.S. 54 to verify that the truck was not stolen.  When he caught up to the vehicle, however, Officer Crayton could not read the truck's license plate number.  The vehicle's license plate light, rather than illuminating the plate from the side, appeared to be affixed in the center of the plate.  The light's odd placement - combined with the NMSP cruiser's headlights - produced a strong glare.  Even from Officer Crayton's position, less than fifty feet behind the vehicle, the glare rendered the truck's license plate number indiscernible to the officer.[1]

Unable to verify the truck's registration, Officer Crayton activated his emergency equipment and initiated an investigatory *Terry v. Ohio*, 392 U.S. 1 (1968), stop.[2]  The NMSP cruiser's video equipment - positioned on the patrol unit's dashboard - began recording at 11:51:32 p.m., when the officer's emergency lights illuminated.  Coming to a stop directly behind the truck, with his emergency lights activated, Officer Crayton was able to read the plate.  The officer radioed NMSP dispatch, at 11:51:44 p.m., with the license plate number.

As Officer Crayton approached the vehicle, he observed that the license plate light was indeed secured oddly: the light was secured, in the middle of the plate, through a hole intended for a trailer hitch.  Although the light was situated in front of the plate, it did not obstruct the license plate number.  Nevertheless, by illuminating the plate from below, rather than from the side, the truck's license plate was not "clearly legible" from "a distance of fifty feet to the rear . . . ."  *See* N.M. STAT.

---

[1]Officer Crayton testified that his eyesight does not - and did not the night of February 23, 2006 - require him to wear corrective lenses.

[2]It is uncontested that, prior to the stop - aside from the illegible license plate and the fact that the truck slowed from 55 mph to 50 mph - the officer observed nothing else unusual about the vehicle or the driver's conduct.

ANN. § 66-3-805(C) (Mitchie 2005).[3]

Approaching the vehicle on the passenger's side at 11:52:28 p.m., the officer observed fishing equipment in the bed of the truck. Reaching the passenger's window, Officer Crayton informed the driver (Marquez-Diaz) that he had been pulled over due to the license plate light. Shining his flashlight into the truck cab, the officer saw two individuals: Marquez-Diaz and one passenger, later identified as Robert Cacho.

Officer Crayton asked for Marquez-Diaz's driver's license, vehicle registration, and proof of insurance. Marquez-Diaz provided the documents to Officer Crayton at 11:52:55 p.m. During this exchange, the officer testified that he noticed that there was an air freshener, suspended from the rear-view mirror, and that the ignition key was not attached to any other keys. From the vehicle registration, Officer Crayton noted that the vehicle was a 1997 Dodge Ram truck, registered in Marquez-Diaz's name, out of San Elizario, Texas.

At 11:53:17 p.m., the officer asked Marquez-Diaz to exit the truck and meet him by the NMSP cruiser. Marquez-Diaz complied with the officer's request.[4]

The officer contacted NMSP dispatch at 11:55:14 p.m. Thereafter, Officer Crayton relayed Marquez-Diaz's license and registration numbers, asked the operator to verify the documents' validity, and requested a "wants/warrants" check.

---

[3]The NMSP cruiser's video recording reflects how over-illumination rendered the plate indiscernible from Officer Crayton's position. While the cruiser's emergency "reds" and "take-down" lights were already on - therein, providing more illumination than prior to the time the officer initiated the stop - where the video recording begins, the significant glare evidenced demonstrates how over-illumination obscured Marquez-Diaz's license plate number.

[4]According to Officer Crayton's undisputed testimony, throughout the remainder of the detention, Marquez-Diaz stood near the NMSP cruiser's hood on the passenger's side. The officer stood behind the open passenger-side door, which placed him within arm's length of his patrol-unit radio.

Waiting to hear from dispatch, Officer Crayton explained again why he stopped Marquez-Diaz and how the rear license plate should be illuminated.  Next, the officer asked Marquez-Diaz a series of routine questions about his travel plans.  The officer inquired where Marquez-Diaz was going and why.  Marquez-Diaz told the officer that he: (1) was traveling from El Paso to Carrizozo for the weekend "to look around"; (2) lived in San Elizario; (3) had never been to Carrizozo; (4) did not know anyone there; (5) planned to stay at a hotel in Carrizozo that evening, but did not know which one; and (6) did not intend to travel anywhere besides Carrizozo that weekend.[5]

At 11:57:22 p.m., NMSP dispatch confirmed to Officer Crayton that Marquez-Diaz owned the 1997 Dodge Ram truck, that the vehicle was registered out of San Elizario, Texas, and that both Marquez-Diaz and the truck were "clear" (i.e, not associated with any outstanding "wants" or warrants).[6]  Accordingly, the officer began to complete a traffic-citation form related to Marquez-Diaz's illegible license plate.  Still waiting for the wants/warrants check, Marquez-Diaz engaged the officer in conversation, primarily about Carrizozo and the weather.

Officer Crayton then asked Marquez-Diaz about his passenger.  Marquez-Diaz indicated that his passenger's name was "Robert" and that he knew him because they "used to work together."  Next, the officer asked Marquez-Diaz about the fishing gear in the truck's rear.  Marquez-Diaz explained that he intended to go fishing in Carrizozo.  Officer Crayton asked where; Marquez-Diaz replied that he did not know.  Thereafter, Marquez-Diaz continued to engage the officer in

---

[5]Officer Crayton referred to Carrizozo as "Carrizo" several times at the hearing.  Carrizo, New Mexico is a Lincoln County community, situated in the Sacramento Mountains, southwest of Ruidoso, New Mexico.  The NMSP recording of the stop and the testimony at the June 7, 2006 evidentiary hearing, however, are clear: Marquez-Diaz and Cacho's stated destination was Carrizozo, *not* Carrizo.

[6]San Elizario, Texas is situated adjacent to the international border with Mexico, roughly twenty miles southeast of El Paso, Texas.  Officer Crayton asked Marquez-Diaz where San Elizario was located.  Marquez-Diaz stated that San Elizario was located near Socorro, Texas; the officer knew that Socorro was near El Paso.

4

conversation about the Carrizozo area.  The officer observed that, throughout this exchange, Marquez-Diaz appeared quite nervous: he was walking around, kicking a hole in the dirt, placing his hands in his pockets, and, at times, leaned his torso on the NMSP cruiser's hood.  Several times the officer reminded Marquez-Diaz to keep his hands out of his pockets.[7]

Officer Crayton then decided to speak with Marquez-Diaz's passenger.  Leaving Marquez-Diaz by the NMSP cruiser, at 12:00:56 a.m. on February 24, 2006, the officer approached the passenger's side window.  In response to Officer Crayton's inquiries about his travel plans, Cacho stated that: (1) he and Marquez-Diaz were headed for Carrizozo; (2) his parents were going to meet him there; (3) his parents were traveling from El Paso; (4) he knew one person in Carrizozo, his cousin, but that he did not know his cousin's address; (5) his parents planned to stay with his cousin; (6) he and Marquez-Diaz intended to stay at a hotel in Carrizozo, but he did know which hotel; (7) he did not know exactly how he was going to meet up with his parents; (8) he was not going to stay in Carrizozo the whole weekend; (9) he planned, most likely, to follow his parents to Las Vegas, New Mexico from Carrizozo; and (10) Marquez-Diaz would go with them to Las Vegas.[8]

Thereafter, Officer Crayton asked Cacho whether he knew the driver's name.  In response, Cacho said "Marquez-Diaz."  When the officer asked what Marquez-Diaz's first name was, Cacho stated that he did not know.  Officer Crayton testified that, during this conversation: Cacho looked straight ahead with a "blank stare," but when Cacho stated that he did not know Marquez-Diaz's first name, he "put his head down."  At that point, Officer Crayton asked the passenger for his driver's

---

[7]It is uncontested that the night in question, February 23, 2006, was a chilly mid-winter evening.  The tape shows that Marquez-Diaz pulled the hood of his sweatshirt over his head upon exiting his vehicle and commented on the cool temperature several times to the officer.  The video shows that Officer Crayton, however, was not wearing a coat or any other cold-weather attire that evening.

[8]U.S. 54 connects Carrizozo and Las Vegas, New Mexico.

license, which Cacho promptly produced.

Returning to the NMSP cruiser at 12:02:37 a.m., Officer Crayton called dispatch.   At 12:03:30 a.m., the officer called Cacho's license into dispatch for a wants/warrants check, asked dispatch to verify the make and model of the truck, and requested an "EPIC" border-crossing check on both Marquez-Diaz and Cacho.  Preparing the traffic citation, the officer asked Marquez-Diaz if they were going to meet anyone in Carrizozo.  Marquez-Diaz stated that they were not.

Dispatch reported, at 12:04:51 a.m., that Cacho's license was valid and not associated with any wants or warrants.  The operator also confirmed that Marquez-Diaz's truck was a 1997 Dodge Ram.  Thereafter, Officer Crayton - continuing to complete the traffic citation - told Marquez-Diaz that Cacho did not know Marquez-Diaz's first name.  To this, Marquez-Diaz expressed disbelief.  He stated that Cacho referred to him by his first name.  Officer Crayton asked if there was a reason why Cacho would not know Marquez-Diaz's name.  Marquez-Diaz proffered that Cacho was probably just nervous about speaking to a policeman.

At 12:05:58 a.m. - nearly fifteen minutes into the stop - Marquez-Diaz asked the officer what he was filling out.  Officer Crayton responded that he would "let [him] know in just a second," but asked Marquez-Diaz if he knew "what it [wa]s."  Marquez-Diaz said he did not.  Unbeknownst to Marquez-Diaz, Officer Crayton - having completed the traffic citation - was filling out a "Consent to Search Form."  Continuing to prepare the paperwork, the officer asked him what Cacho did for a living.  Marquez-Diaz replied that he did not know.

The officer completed the citation and the "Consent to Search Form."  At 12:06:59 a.m., the officer returned both Marquez-Diaz and Crayton's documents to Marquez-Diaz.

Between 12:07 a.m. and 12:07:35 a.m., Officer Crayton handed the traffic citation to

Marquez-Diaz, which Marquez-Diaz then signed.  During this interval, Officer Crayton described the traffic citation, explaining: (1) it was "just a warning," (2) that it did not require a court appearance, (3) how to properly illuminate the license plate; and (4) where in Carrizozo Marquez-Diaz could get the light repaired.  Marquez-Diaz then signed the document.  Officer Crayton issued the citation to Marquez-Diaz, at 12:07:53 a.m., pursuant to N.M. STAT. ANN. § 66-3-805(C).

Officer Crayton then asked Marquez-Diaz if he could ask him a few additional questions.[9] Marquez-Diaz answered affirmatively.   Officer Crayton proceeded to ask several "clarifying questions" about his travel plans.  Marquez-Diaz's responses were consistent with his earlier answers, with one exception: he added that he and Cacho might also go to Las Vegas.

Next, Officer Crayton asked Marquez-Diaz if he had any contraband in the truck, such as marijuana, hashish, methamphetamine, explosives, and weapons.  Marquez-Diaz answered each successive question in the negative.

Immediately thereafter, at 12:08:59 a.m., the officer asked if he could search the truck. Marquez-Diaz indicated that he could.  Officer Crayton presented Marquez-Diaz with a "Consent to Search Form."  He told Marquez-Diaz that the form was available in English and Spanish and that he should read it in whichever language "he was most fluent."  The officer did not read the document to Marquez-Diaz.  Marquez-Diaz signed the "Consent to Search" form at 12:10 a.m.  (*See* Pl.'s Resp. Ex. 1.)

Thereafter, Officer Crayton told Marquez-Diaz that he would begin his vehicle search momentarily and pat-down Marquez-Diaz, explaining it was for "officer safety."  At 12:11:05 a.m.,

---

[9]The Court finds that Officer Crayton did not tell Marquez-Diaz or Cacho that they were free to leave after returning their documents and issuing the traffic citation.

NMSP dispatch radioed Officer Crayton that the EPIC check did not reveal anything material about Marquez-Diaz, the truck, or Cacho.[10]

The officer returned to the truck at 12:11:52 a.m. to explain the vehicle search to Cacho. Officer Crayton asked Cacho the same questions - in rapid succession - that he had asked Marquez-Diaz. Cacho indicated that the truck did not contain any contraband.

At this point, 12:12:11 a.m., Officer Crayton asked Cacho if he could ask him a few additional questions because he and Marquez-Diaz had "a couple different stories going on." Cacho replied that he "d[idn't] care." Cacho's answers to the officer's "clarifying questions" were consistent with his previous responses, with four exceptions. Cacho indicated, for the first time, that he (1) planned to go fishing that weekend in Carrizozo; (2) had known Marquez-Diaz from "a couple years back"; (3) had not informed Marquez-Diaz that he planned to meet his parents in Carrizozo; and (4) did not know where Marquez-Diaz worked.

At approximately 12:13:08 a.m., Officer Crayton asked Cacho if he could conduct a vehicle search; Cacho responded that he could. After explaining that Cacho could complete the form in English or Spanish, the officer handed Cacho the "Consent to Search" form. Cacho signed the document. Officer Crayton told Cacho to exit the truck and proceeded to pat-down Cacho for weapons.

Officer Crayton walked back to the NMSP cruiser and briefly explained to Marquez-Diaz how the vehicle search would be conducted. The officer proceeded to search the pickup truck clockwise, beginning at the back of the vehicle. When the officer reached the cab, the truck's heater

---

[10]The EPIC check showed that neither Marquez-Diaz nor the truck had crossed the international border within the preceding twelve months. It indicated that Cacho had crossed the international border twice during that period.

caught his attention: although the fan was running, no air was coming out of the vents.  Later, Officer Crayton crouched down, under the steering-wheel shaft, and saw a "black cellophane brick."[11]  The officer extracted the package from a natural compartment above the pedals.  When Officer Crayton punctured the package using his knife, a white powdery substance flew up into his face.

At this point, Officer Crayton testified that he drew his gun, handcuffed Marquez-Diaz and Cacho, and placed them in the rear of the NMSP cruiser.  The officer then radioed NMSP dispatch for a back-up officer, as well as an ambulance, fearing that he had inhaled the substance.

Officer Crayton administered a narcotics field-test.  This "presumptive test" indicated that the white powder was methamphetamine.  Still waiting for an ambulance, the officer sat in the passenger's side of the patrol unit.  Officer Crayton testified that Marquez-Diaz and Cacho asked him, at that time, "why they were arrested and what [the officer] found."  In response, the officer told the subjects that he "found a lot of methamphetamines" in the truck.

Shortly thereafter, the ambulance arrived at the scene, treated Officer Crayton, and discharged him.  At that point, the officer advised Marquez-Diaz and Cacho of their *Miranda v. Arizona*, 384 U.S. 436 (1966), rights.  During this time, New Mexico Narcotics Agent Sam Hooper arrived as back-up.[12]  Officer Crayton then contacted a towing company.  Marquez-Diaz's pickup truck was towed to the Lincoln County Sheriff's Office in Carrizozo; Officer Crayton followed in his NMSP cruiser.

Marquez-Diaz and Cacho were allowed to use the telephone at the Sheriff's Office.  While

---

[11]Officer Crayton testified that, in his experience, black cellophane packaging is commonly used by traffickers to disguise narcotics.  He also testified that Dodge pickup trucks like Marquez-Diaz's have a "natural compartment" above the pedals, where traffickers often hide controlled substances.

[12]The Court does not find that either Marquez-Diaz or Cacho were *questioned* by Officer Crayton or Agent Hooper between the time Officer Crayton arrested them and when he advised them of their *Miranda* rights.

drafting his Affidavit for Search Warrant related to the truck,  Officer Crayton overheard Cacho - speaking on the phone - say that he had been "busted with a lot of cocaine."  Thereafter, Marquez-Diaz and Cacho were transported to the Lincoln County Detention Center ("LCDC").

Pending approval of a search warrant, NMSP towed Marquez-Diaz's vehicle to an impound lot.  At that point, a second field test indicated that the white powdery substance in the cellophane-wrapped brick was, in fact, cocaine, not methamphetamine.

The state district court executed a warrant to search Marquez-Diaz's truck at 4:59 a.m. on February 24, 2006.  Authorities' search of the vehicle yielded twenty-nine plastic-wrapped bundles, containing a total of 30 kilograms of cocaine.

Later, at the LCDC, Officer Crayton issued an amended traffic citation under N.M. STAT. ANN. § 66-3-18 and completed Marquez-Diaz and Cacho's "booking sheets."[13]  The officer testified that, during this process, Marquez-Diaz asked him "what [they] found in the truck" and "how much."

On March 15, 2006, a federal grand jury charged Marquez-Diaz in a two-count indictment with violating: (1) 21 U.S.C. § 846 (1999) - "Conspiracy to Distribute 5 Kilograms and more of Cocaine"; (2) 21 U.S.C. §§ 841 (a)(1), (b)(1)(A) (1999) - "Possession with Intent to Distribute 5 Kilograms and more of Cocaine"; and (3) 18 U.S.C. § 2 (2000) - "Aiding and Abetting."

## II.    Discussion.

### A.    The *Terry* stop did not violate the Fourth Amendment.

#### 1.    Police officers must have "reasonable suspicion" to initiate a *Terry* stop; the scope of an investigatory detention must be reasonable.

---

[13]Officer Crayton prepared and executed an "amended traffic citation" at Agent Hooper's suggestion. Agent Hooper believed that Marquez-Diaz's license plate light violated N.M. STAT. ANN. § 66-3-18 (Mitchie 2005) ("[A vehicle's registration plate] shall be . . . maintained free from foreign material and in a condition to be clearly legible."), more clearly than N.M. STAT. ANN. § 66-3-805(C).

The Fourth Amendment proscribes "unreasonable searches and seizures" by government agents.  U.S. CONST. amend. IV.  These protections extend to investigatory stops made by state police officers on roving patrol.  *See United States v. Williams*, 403 F.3d 1203, 1206 (10th Cir. 2005) (citing *Terry*, 392 U.S. at 19-20).  "A routine traffic stop constitutes an investigative detention and is examined under the principles announced in *Terry v. Ohio*."  *Id.*

A two-part test is used to determine whether a *Terry* stop violates the Fourth Amendment.  First, the stop must be "justified at its inception."  *Id.*  "'A traffic stop is valid under the Fourth Amendment if the stop is based on an observed traffic violation or if the police officer has reasonable articulable suspicion that a traffic or equipment violation has occurred or is occurring.'"  *Id.* (quoting *United States v. Botero-Ospina*, 71 F.3d 783, 787 (10th Cir. 1995) (en banc)).  Therein, the Government is required to present "'specific and articulable facts'" that - "'taken together with rational inferences from those facts'" - demonstrate that Officer Crayton had reason to believe Marquez-Diaz "ha[d] committed or [wa]s about to commit a crime."  *See United States v. Johnson*, 364 F.3d 1185, 1188 (10th Cir. 2004) (quoting *Terry*, 392 U.S. at 20).

Second, the Government must show that the officer conducted the *Terry* stop in a reasonable manner.  *See id.*  That is, the officer's conduct in executing the stop must be "'reasonably related in scope to the circumstances which justified the interference in the first place.'"  *Id.* (quoting *United States v. Shareef*, 100 F.3d 1491, 1500 (10th Cir. 1996)).  "An officer may detain a motorist for questioning unrelated to the initial traffic stop if he has an objectively reasonable and articulable suspicion that illegal activity has occurred, or the driver voluntarily consents to further questioning."  *Williams*, 403 F.3d at 1206 (quoting *United States v. Galindo-Gonzales*, 142 F.3d 1217, 1221 (10th Cir. 1998)).

Determining whether the Government satisfied this two-step inquiry is "judged by an objective standard taking the totality of the circumstances and information available to the officer[] into account." *Id.* (internal quotation marks and citations omitted). District courts must "'accord deference to [the officer's] ability to 'draw on (his) own experience and specialized training to make inferences from and deductions about the cumulative information available to (him) that might well elude an untrained person.'" *Johnson*, 364 F.3d at 1193 (quoting *United States v. Gandara-Salinas*, 327 F.3d 1127, 1130 (10th Cir. 2003)) (alterations in original).

As noted above, Marquez-Diaz challenges both the validity and scope of Officer Crayton's *Terry* stop. He moves to suppress all evidence stemming from the officer's investigatory detention, as "fruit of the poisonous tree." *See Wong Sun*, 371 U.S. 471, 484-85 (1963).

### 2. The Stop: Officer Crayton had "reasonable suspicion" to initiate the *Terry* stop.

Marquez-Diaz challenges the validity of Officer Crayton's *Terry* stop, arguing that the officer did not have "reasonable suspicion" to lawfully detain him. Specifically, Marquez-Diaz argues that there was nothing inherently suspicious in slowing from 55 mph to 50 mph and that, at the time Officer Crayton initiated the stop, he had committed no "traffic or equipment violation." *Williams*, 403 F.3d at 1206 (internal quotation marks and citation omitted).

Pursuant to N.M. STAT. ANN. § 66-3-18(A), a vehicle's registration plate "shall be in a place and position so as to be clearly visible, and it shall be maintained free from foreign material and in a condition to be clearly legible." *See* N.M. STAT. ANN. § 66-3-18(A). Additionally, under New Mexico law, "[e]ither a tail lamp or a separate lamp shall be so constructed and placed as to illuminate with a white light the [vehicle's] rear registration plate and render it clearly legible from a distance

12

of fifty feet to the rear . . ."  *See* N.M. S̲ᴛᴀᴛ. A̲ɴɴ. § 66-3-805(C).

Contrary to Marquez-Diaz's position, the Court finds that the license plate was neither "clearly visible" nor "clearly legible" from fifty feet behind the truck.  *See* N.M. S̲ᴛᴀᴛ. A̲ɴɴ. §§ 66-3-18(A), 66-3-805(C).  Therefore, because the officer detained Marquez-Diaz after observing a traffic violation, Officer Crayton initiated the *Terry* stop lawfully.

### 3.   The Scope: Officer Crayton's detention did not exceed the scope of the *Terry* stop.

Marquez-Diaz argues that, even if the initial stop was valid, Officer Crayton's conduct unlawfully exceeded the scope of the initial *Terry* stop.  To be clear, when the officer inquired about Marquez-Diaz's travel plans, the encounter was not consensual.  *See United States v. Ledesma*, 447 F.3d 1307, 1314 (10th Cir. 2006).  Officer Crayton retained possession of Marquez-Diaz's license and vehicle documents and, consequently, Marquez-Diaz was not free to leave.  *See id.*; *see United States v. Hernandez*, 93 F.3d 1493 (10th Cir. 1996) ("A traffic stop may become a consensual encounter if the officer returns the license and registration and asks questions without further constraining the driver by an overbearing show of authority.").  The legality of a traffic stop's scope, therefore, turns on the duration and manner in which Officer Crayton executed the investigatory detention.  *See Ledesma*, 447 F.3d at 1314.

The Court of Appeals for the Tenth Circuit is clear that, when an officer stops a vehicle for a traffic violation, it is permissible to detain motorists for "a short period of time" to verify their license and registration and to run a warrants check.  *See United States v. Holt*, 264 F.3d 1215, 1230 (10th Cir. 2001) (en banc)  (during *Terry* stop, police may detain motorists to run a warrants check "even though the purpose of the stop had nothing to do with such prior criminal history") (internal

quotation marks and citation omitted).  Recently, the Tenth Circuit has explained that when an officer questions a detainee, before returning their driver's license, there are three distinct "intervals" for Fourth Amendment purposes: (1) "the initial encounter" when the officer requests, and the motorist retrieves their license, registration, and proof of insurance; (2) "the time during which [the officer] writ[es] the warning ticket"; and (3) the time when the officer is "waiting for the dispatch operator to verify" the documents' validity.  *See United States v. Alcaraz-Arellano*, 441 F.3d 1252, 1258-59 (10th Cir. 2006).  Clearly, however, no Fourth Amendment violation will result so long as the officer's questioning did not "prolong the detention" beyond "the time reasonably required to complete" each task, respectively.  *Id.* (internal quotation marks and citations omitted).  *See also Muehler v. Mena*, 544 U.S. 93, 101 (2005) ("Even when officers have no basis for suspecting a particular individual, they may generally ask questions of that individual [and] ask to examine the individual's identification . . .") (internal quotation marks and citation omitted).  In any event, if an officer's "prolongation of the stop" was supported by reasonable suspicion, no Fourth Amendment violation resulted.  *See Alcaraz-Arellano*, 441 F.3d at 1258-59.

Here, it first bears underscoring that Officer Crayton's initial questioning regarding Marquez-Diaz's travel plans was proper.[14]  *See Holt*, 264 F.3d at 1230.  The "initial encounter," when Officer

---

[14]The Tenth Circuit has expressly held that officers may ask "questions relating to the motorist's travel plans."  *Id.*  Indeed, "as long as the [officer's] questioning did not extend the length of the detention . . . there is no Fourth Amendment issue with respect to the content of the questions."  *United States v. Wallace*, 429 F.3d 969, 974 (10th Cir. 2005); *see Alcaraz-Arellano*, 441 F.3d at 1258-59  (citing *United States v. Childs*, 277 F.3d 947, 949 (7th Cir. 2002) (en banc) ("questions that do not increase the length of detention (or that extend it by only a brief time) do not make the custody itself unreasonable")).

> Notably, in a recent, unpublished, decision applying *Alcaraz-Arellano*, the Tenth Circuit explained:
> [I]t is reasonable for an officer to ask questions about the motorist's *travel plans* and authority to operate the vehicle."  Questioning on *other topics* is permitted as long as that questioning does not prolong the length of the traffic stop.  If the questioning on *additional topics* prolongs the stop, the extended detention must be supported by consent or reasonable suspicion of criminal activity.

*United States v. Slater*, No. 05-4226, 2006 WL 1619258 (unpublished) (10th Cir. Jun. 13, 2006) (quoting

Crayton stated why he had stopped the truck and asked for, and obtained, Marquez-Diaz's documents, lasted less than a minute (11:52:28 p.m. - 11:52:55 p.m.).  *See id.* (2.5 minutes not unreasonable delay).  The interval during which the officer waited for NMSP dispatch to verify Marquez-Diaz's license, registration, ownership, and to run a warrants/wants check lasted only two minutes (11:55:14 p.m. - 11:57:22 p.m.).  *See id.* (5.5 minutes not unreasonable delay).

Nearly fifteen minutes (11:52:55 p.m. - 12:07:43 a.m.) elapsed before the officer issued "the warning ticket."  *Cf. id.* (issuing citation 10 minutes after stop not unreasonable).[15]  But, notably, during that time, Officer Crayton was waiting on the EPIC check, another source with information regarding potential criminal activity.  Indeed, it took dispatch more than six minutes (12:03:30 a.m. - 12:11:05 a.m.) to complete the EPIC inquiry on both subjects and the truck.  *See Holt*, 264 F.3d at 1230; *United States v. Kaguras*, No. 05-8103, 2006 WL 1585989 (unpublished) (10th Cir. Jun. 9, 2006) ("During a routine traffic stop, an officer may . . . run *requisite computer checks* . . .") (emphasis added).  In any case, because Officer Crayton's inquiries about Marquez-Diaz and Cacho's travel plans "did not appreciably lengthen the detention . . . ," they did not improperly exceed the *Terry* stop's scope.[16]  *See Alcaraz-Arellano*, 441 F.3d at 1259.

---

*Alcaraz-Arellano*, 441 F.3d at 1258-59) (emphasis added).  The *Slater* court seems to suggest that, under *Alcaraz-Arellano*, an officer's questions regarding a motorist's travel plans require "no additional Fourth Amendment justification."  *See id.*  If so, Officer Crayton's inquiries regarding Marquez-Diaz and Cacho's travel plans would not factor into the Court's "unreasonable-prolongation" analysis of the *Terry* stop at all.  *Cf. Alcaraz-Arellano*, 441 F.3d at 1258-59 (finding that, where a deputy asked "only a few questions about travel plans": "Such *limited* questioning is proper, because an officer may routinely ask about travel plans . . . during a lawful traffic stop.") (emphasis added).

[15]To be clear, Officer Crayton acted properly in conducting this inquiry outside the vehicle.  *See Holt*, 264 F.3d at 1222 ("An officer also may order the driver and passengers out of the vehicle in the interest of officer safety, even in the absence of any particularized suspicion of personal danger.").

[16]The Court's conclusion comports with the Tenth Circuit's recent decision in *United States v. Ledesma*.  *See Ledesma*, 447 F.3d at 1314.  As in *Ledesma*, here, Officer Crayton observed a "continuing violation."  *See id.* at 1312.  Accordingly, the traffic violation in failing to place the light illuminating "rear registration plate and

Even assuming, *arguendo*, that the questioning extended the stop's duration, the *Terry* stop would be lawful if Officer Crayton had an objectively reasonable and articulable suspicion of illegal activity to justify prolonging the detention. *See United States v. Williams*, 271 F.3d 1262, 1268 (10th Cir. 2002). Because the officer had "reasonable suspicion" when he asked about Marquez-Diaz and Cacho's travel plans, he did not improperly exceed the scope of the investigatory detention. *See Alcaraz-Arellano*, 441 F.3d at 1258-59.

It is material that, prior to asking Marquez-Diaz about his travel plans, the officer was aware that: (1) the truck had both an air freshener, as well as only a single key in the ignition, which - in the officer's experience - were indicative of criminal smuggling activity; (2) U.S. 54 runs directly from El Paso, Texas, which is adjacent to the international border with Mexico, to Carrizozo; (3) the officer detained Marquez-Diaz less than 150 miles north of the border; (4) Marquez-Diaz registered the truck out of San Elizario, Texas, another border town; (5) border towns provide attendant possibility for criminal activity, including drug trafficking; and (6) it was quite late at night.[17]

Through Officer Crayton's routine inquiries concerning Marquez-Diaz's travel plans, he acquired reasonable suspicion. That is, at that time, the officer had a "particularized and objective

---

render it clearly legible from a distance of fifty feet to the rear . . ." - "'remained true even after [the officer] approached the truck and was able, at that point, to read it.'" *See id.* at 1314 (quoting *United States v. DeGasso*, 369 F.3d 1139, 1149 (10th Cir. 2004)). Accordingly, Officer Crayton did not exceed the scope of the *Terry* stop, "'even after [he] approached the [vehicle] and was able, at that point, to read [the registration number],'" when the officer"issued a written warning," "verified [the defendant's] license and registration information, and asked preliminary questions about travel plans." *Id.* (officer detained defendant for improperly displaying a registration tag) (quoting *United States DeGasso*, 369 F.3d 1139, 1149 (10th Cir. 2004)).

[17]Viewed independently, driving a pickup truck registered out of San Elizario and traveling from El Paso, Texas is not suspicious. *See United States v. Santos*, 403 F.3d 1120, 1132 (10th Cir. 2005) (travel between two known drug source locations is a weak indicator of criminal activity where the two locales are "major population centers": travel is not "suspicious per se."). At the same time, this Court is mindful that it "may not evaluate and reject each [reasonable suspicion] factor in isolation." *Gandara-Salinas*, 327 F.3d at 1130 (citing *United States v. Arvizu*, 534 U.S. 266, 274-75 (2002)). *Accord Santos*, 403 F.3d at 1133 ("it would be legal error to employ a divide-and-conquer approach").

basis for suspecting" Marquez-Diaz, "the person stopped," of "criminal activity." *See Alcaraz-Arellano*, 441 F.3d at 1259-60 (internal quotation marks and citation omitted).

Contributing to the reasonable suspicion calculus, was Officer Crayton's knowledge that: (1) Marquez-Diaz appeared unusually nervous after exiting the truck;[18] (2) Carrizozo is a very small town, with an estimated population of 1500 persons; (3) Carrizozo is hardly a fishing Mecca, with only one fish-stocked tank; and (4) Marquez-Diaz repeatedly tried to engage him in conversation, which the officer knew to be a common drug-trafficker practice in trying to divert officers' attention. *Cf. United States v. Santos*, 403 F.3d 1120, 1129 (10th Cir. 2005) ("Implausible travel plans can contribute to reasonable suspicion.").

Officer Crayton's reasonable suspicion grew even stronger when, finding Marquez-Diaz's weekend plans suspicious under the circumstances, he questioned Cacho. That is, after speaking to Cacho, the officer knew that Cacho: (1) denied knowing Marquez-Diaz's first name, despite Marquez-Diaz's claims that the two previously worked together and that Cacho addressed him by his first name; (2) nevertheless, planned to go to Carrizozo with Marquez-Diaz for the weekend; (3) stated he intended to meet up with his parents in Carrizozo, when Marquez-Diaz had only indicated they planned to go to Carrizozo; (4) appeared nervous, looking straight ahead with a "blank stare," until Cacho stated that he did not know Marquez-Diaz's first name. *See id.* at 1131 ("Confusion

---

[18]The Court finds that the most significant fact evidencing Marquez-Diaz's unusual nervousness was that he repeatedly leaned on the NMSP cruiser, at times laying his entire torso on the hood. *See Santos*, 403 F.3d at 1127 ("When a motorist detained for a routine traffic violation, such as speeding, shows unusual signs of nervousness, this may be considered *as part* of the totality of circumstances a reasonable law enforcement officer would analyze in investigating possible crimes . . . . But nervousness is a sufficiently common that . . . . [o]nly extraordinary and prolonged nervousness can weigh significantly in the assessment of reasonable suspicion.") (internal quotation marks and citations omitted). Additionally, the Court finds it significant that Officer Crayton testified that, in light of his training and experience, Marquez-Diaz and Cacho exhibited unusual nervousness during the stop. (*See also* Gov't Ex. 4 at 2 (Officer Crayton's sworn "Affidavit for Search Warrant" executed before 4:59 a.m. on Feb. 24, 2006) ("the driver exhibited signs of being *extremely nervous*") (emphasis added).)

about details is often an indication that a story is being fabricated on the spot."); *cf. id.* (inconsistency regarding details of travel plans is not "sufficient, in and of itself, to warrant detaining . . . a motorist" but may contribute to reasonable suspicion determination). Throughout his inquiry regarding Marquez-Diaz and Cacho's travel plans, therefore, Officer Crayton clearly had "reasonable suspicion to detain [them] for further investigation." *See Alcaraz-Arellano*, 441 F.3d at 1260.

Moreover, it bears underscoring that it is unnecessary for these facts to independently give rise to reasonable suspicion. *See Santos*, 403 F.3d at 1133 (citing *United States v. Arvizu*, 534 U.S. 266, 273 (2002)). Instead, they must be viewed together, in context, because "the ultimate assessment of reasonable suspicion depends on the totality of the circumstances." *E.g. Gandara-Salinas*, 327 F.3d at 1130 ("law enforcement officer may assess these factors in light of his experience and specialized training").[19]

Taking into account "the totality of the circumstances and information available" to Officer Crayton, the officer had "reasonable suspicion" to believe that criminal activity was afoot. *See id*. Accordingly, the officer's routine questioning of Marquez-Diaz and Cacho did not undermine the *Terry* stop's legality. *See Santos*, 403 F.3d at 1133; *Johnson*, 364 F.3d at 1188. *See also United States vs. Mendez*, No. 04-2279, slip. op. at 12 (unpublished) (10th Cir. Jun. 14, 2006) ("While any one of these factors is not by itself proof of any illegal conduct and is quite consistent with innocent travel, . . . taken together they amount to reasonable suspicion.") (internal quotation marks and citation omitted).

---

[19]Officer Crayton's four-year tenure as a NMSP officer assigned to the Ruidoso and Deming, New Mexico areas, as well as his training in drug interdiction, further cement the Court's finding that the *Terry* stop was initiated and conducted lawfully. *See Gandara-Salinas*, 327 F.3d at 1130.

18

**B.      The warrantless search of Defendant's vehicle did not violate the Fourth Amendment.**

Marquez-Diaz did not expressly challenge the validity of his consent to Officer Crayton's search of his vehicle in his briefing.  Because the issue arose at the June 7, 2006 evidentiary hearing, however, the Court addresses it here.

"Without reasonable suspicion, a warrantless search of luggage or a vehicle is unreasonable, notwithstanding verbal consent by the owner, if the 'consent to the suspicionless search was involuntary.'"  *Ledesma*, 447 F.3d at 1314 (quoting *United States v. Drayton*, 536 U.S. 194, 206 (2002)).  As the Tenth Circuit recently explained:

> officers need not expressly inform suspects that they are free to go before requesting permission to conduct a search.  Instead, voluntariness is a question of fact to be determined from all the circumstances.  The central question is whether a reasonable person would believe he was free to leave or disregard the officer's request.

*Id.* (internal quotation marks and citations omitted).

In the context of traffic stops, the Court of Appeals has "identified a number of factors that suggest that an encounter was not consensual, including":

> the "threatening presence of several officers," the "use of aggressive language or tone of voice indicating that compliance with an officer's request is compulsory," the "prolonged retention of a person's personal effects such as identification," the "absence of other members of the public," and the officer's failure to advise the defendant that []he is free to leave.

*Id.* (citations omitted).  Likewise, the Tenth Circuit has recognized factors that may "evidence that an encounter was consensual" such as:

> an officer's "pleasant" manner and a tone of voice that is not "insisting," a public location such as "the shoulder of an interstate highway, in public view," and the prompt return of the defendant's identification and papers.

*Id.* (citations omitted).  Notably, however, "[n]one of these factors is dispositive": "'a court must

19

consider all the circumstances surrounding the encounter' to determine whether consent was voluntary." *Id.* (quoting *Florida v. Bostick*, 501 U.S. 429, 439 (1991)).

Here, the totality of the circumstances clearly indicate that Marquez-Diaz's consent was voluntary. Although the officer did not expressly indicate to Marquez-Diaz or Cacho that they were free to leave after he returned their documents and issued the citation, and the encounter occurred at a remote locale, these facts do not undermine the validity of his consent. *See id.* (no one factor is "dispositive" in the voluntariness inquiry).

Officer Crayton returned Marquez-Diaz and his passenger's documents *before* asking if he could search the truck. The request was made by a single officer, in public view, alongside U.S. 54. *See id.* And, significantly, Officer Crayton asked for Marquez-Diaz's consent in a non-intimidating tone. Indeed, the video recording evidences that the officer's tone *throughout* the encounter was unfailingly friendly, even-tempered, and not "insisting."[20] *See id.*

Additionally, Marquez-Diaz signed a "Consent to Search Form," further bolstering the conclusion that Marquez-Diaz voluntarily consented to the search. *See generally United States v. Masters*, No. 05-7031, 2006 WL 715778, *3 (unpublished) (10th Cir. Mar. 22, 2006) ("The consent

---

[20]In any event, even if Marquez-Diaz's consent was not voluntary, because Officer Crayton had probable cause to search the truck at that point, the evidence that stemmed therefrom is not subject to the Fourth Amendment's Exclusionary Rule: it would have been "inevitably discovered" by authorities. *See United States v. Souza*, 223 F.3d 1197, 1203 (10th Cir. 2000) (citations omitted). *See also Nix v. Williams*, 467 U.S. 431 (1984); *see also Wong Sun*, 371 U.S. at 487-88 (declining to hold that "all evidence is 'fruit of the poisonous tree' simply because it would not have come to light but for the illegal actions of the police").

The Tenth Circuit has noted that its application of the "inevitable discovery exception" in "cases involving violations of the Fourth Amendment" has "turned on whether legal doctrines providing exceptions to the warrant requirement would have inevitably led to discovery of the evidence." *Souza*, 223 F.3d at 1203 (citations omitted). Here, because the so-called "automobile exception" to the warrant requirement is applicable, the officer's probable cause allowed him to lawfully search the truck. *See United States v. Oliver*, 363 F.3d 1061, 1068 (10th Cir. 2004) ("Under the automobile exception, 'police officers who have probable cause to believe there is contraband inside an automobile that has been stopped on the road may search it without obtaining a warrant.'") (quoting *Florida v. Meyers*, 466 U.S. 380, 381 (1984)).

form that Mr. Masters signed supports the district court's conclusion that Mr. Masters at all times knew that he could call an attorney, yet he did not do so.").  Although Officer Crayton neither read the form aloud nor asked him whether he understood the form, there is no evidence that Marquez-Diaz appeared unable to read, or otherwise understand, the document.  Moreover, the officer told Marquez-Diaz that the form was available in both English and Spanish and encouraged him to complete the form in the language in which he was most fluent.

Having heard testimony and reviewed the taped recording of this encounter, the Court finds that Marquez-Diaz voluntarily consented to Officer Crayton's search of his vehicle.  *See Ledesma*, 447 F.3d at 1314.

### C.    No violation of Defendant's Fifth Amendment, *Miranda* rights occurred.

Marquez-Diaz, lastly, maintains that his statements following his arrest should be suppressed. Presumably, Marquez-Diaz's argument - albeit not briefed prior to the June 7, 2006 evidentiary hearing - pertains to his post-arrest statements to Officer Crayton: (1) before the officer read Marquez-Diaz his *Miranda* rights along U.S. 54; and (2) after being advised of his *Miranda* rights at LCDC during his booking, early the morning of February 24, 2006.[21]

No violation of Marquez-Diaz's *Miranda* rights occurred.  "[T]wo requirements must be met before *Miranda* is applicable; the suspect must be 'in custody,' and the questioning must meet the legal definition of 'interrogation.'"  *United States v. Bennett*, 329 F.3d 769, 774 (10th Cir. 2003) (citation omitted).  Undoubtedly, the first requirement is satisfied: Marquez-Diaz was in custody

---

[21]As noted above, Officer Crayton testified that, before advising Marquez-Diaz and Cacho of their *Miranda* rights they asked him - seated in the back of the patrol unit - "why they were arrested and what [the officer had] found."  *See supra* Part I.  The officer also testified that, at the LCDC (i.e. long after he administered the *Miranda* warnings to the subjects along U.S. 54), Marquez-Diaz asked him "what [authorities had] found in the truck" and "how much."  *See supra* Part I.

when he posed both sets of questions to Officer Crayton.

But the second *Miranda* requirement is not satisfied: in both instances, Marquez-Diaz was not subject to police interrogation when he made the incriminating statements.  *See id.*  Indeed, Marquez-Diaz - of his *own* accord - asked Officer Crayton about what authorities' vehicle searches yielded.

Because *Miranda* provides no protection to defendants who are not subject to interrogation, *Miranda* is inapplicable.  *See id.*; *see also Arizona v. Mauro*, 481 U.S. 520, 529 (1987) ("Officers do not interrogate a suspect simply by hoping that he will incriminate himself.").[22]

## III.   Conclusion.

For all the foregoing reasons, Defendant's Motion to Suppress (Doc. 27) is **DENIED**.

_____

**ROBERT C. BRACK**
**UNITED STATES DISTRICT JUDGE**

---

[22]Officer Crayton, as discussed above, informed Marquez-Diaz of his *Miranda* rights after arresting him, but before transporting him to the Lincoln County Sheriff's Office.  *See supra* Part I.  Even if the officer could have read Marquez-Diaz his rights more promptly (i.e., while he waited for the ambulance to arrive), no error occurred: it is undisputed that neither Officer Crayton nor Agent Hooper questioned Marquez-Diaz before administering the *Miranda* warnings.  *See United States v. Blain*, No. 95-6419, 104 F.3d 368, 1996 WL 740849, *6 (unpublished table decision) (10th Cir. Dec 27, 1996) ("To hold otherwise would require *Miranda* warnings in virtually every case immediately upon arrest and effectively eliminate the requirement of interrogation from the *Miranda* analysis.").